**Kamram SARWAR, Appellant,**

v.

**Shazia SARWAR, Respondent.**

**No. WD 62255.**

Missouri Court of Appeals, Western District.

Oct. 14, 2003.

Jack A. Cochran, Blue Springs, MO, for Appellant.

Regina K. Bass, Kansas City, MO, for Respondent.

Before: PAUL M. SPINDEN, P.J., THOMAS H. NEWTON and RONALD R. HOLLIGER, JJ.

THOMAS H. NEWTON, Judge.

Mr. Kamram Sarwar appeals from the trial court's judgment, which dissolved his marriage to Ms. Shazia Samdani. Mr. Sarwar contends that the trial court erroneously determined the physical custody of their child. Mr. Sarwar further contends that the trial court erroneously calculated his Form 14 child support obligation. For the reasons explained below, we affirm the judgment of the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Sarwar and Ms. Samdani[1] were married on December 25, 1996. They have one daughter, Shereen, who was born on August 16, 1999. The record reveals that the parties experienced discord both before and during their marriage. This discord culminated in an argument on January 31, 2001, when Mr. Sarwar put Ms. Samdani out of the house, and she took Shereen to stay with a family member in Virginia.

Mr. Sarwar ultimately filed a petition for dissolution in Jackson County Circuit Court, and Ms. Samdani returned to Missouri with Shereen.

Following a four-day trial, the circuit court issued its Findings of Fact, Conclusions of Law and Decree of Dissolution of Marriage. The trial court determined that it was in Shereen's best interests that the parents be awarded joint legal and physical custody, with Ms. Samdani to have "primary physical custody"[2] of Shereen and with Mr. Sarwar to have parenting time as set forth in the Guardian Ad Litem's parenting plan. The trial court also awarded $500 per month in non-modifiable maintenance to Ms. Samdani for the period from August 1, 2002, to August 1, 2004. Furthermore, the Guardian Ad Litem's Form 14—which the circuit court adopted—neither included this amount as gross income to Ms. Samdani nor excluded it from Mr. Sarwar's gross income. The Form 14 did, however, include an overnight visitation adjustment of ten percent for Mr. Sarwar to account for his expenditures when Shereen stays with him.[3]

## II. STANDARDS OF REVIEW

We will affirm the trial court's child custody judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it

1. Both parties are originally from Pakistan. Mr. Sarwar is employed in the automotive industry and Ms. Samdani is a trained medical doctor who is not licensed in the United States.

2. Although both the trial court and the parties have referred to "primary physical custody" this phrase is a misnomer, as we explained recently in *Loumiet v. Loumiet*, 103 S.W.3d 332 (Mo.App. W.D.2003). The trial court can award joint physical custody or sole physical custody, but section 452.375.1(1) makes no mention of primary physical custody. *See Id.*

at 336–38. Because the trial court awarded joint legal and physical custody, we discern that the trial court used the word "primary" to denote that although the court was awarding joint physical custody, Ms. Samdani would have a greater share of Shereen's physical custody than Mr. Sarwar. The question, therefore, is whether the trial court erred in awarding a greater share of physical custody to Ms. Samdani.

3. It is not clear from the record whether Mr. Sarwar submitted his own Form 14.

erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's child custody determination is entitled to great deference. As we have said before:

> We give greater deference to the trial court's determination in child custody proceedings than in any other type of case. A trial court is vested with considerable discretion in determining custody questions, and appellate courts should not overturn the trial court's findings unless they are manifestly erroneous and the child's welfare compels a different result. The judgment must be affirmed under any reasonable theory supported by the evidence and should be set aside only upon a firm belief that the trial court's judgment was incorrect. As long as the record contains credible evidence to support the trial court's beliefs, we will not substitute our judgment for that of the trial court.

*Wallace v. Chapman*, 64 S.W.3d 853, 858 (Mo.App. W.D.2002) (internal quotations and citations omitted).

■ We view the evidence and its permissible inferences in the light most favorable to the trial court's ruling, disregarding all contrary evidence and inferences. *Johnson v. Johnson*, 839 S.W.2d 714, 717 (Mo.App. W.D.1992). "The trial court is in the best position to judge the credibility of the witnesses and may believe all, part or none of any witness's testimony." *Gant v. Gant*, 923 S.W.2d 527, 530 (Mo.App. W.D.1996). We defer to the trial court's decision even if the evidence could support a different conclusion. *Johnson*, 839 S.W.2d at 717. We further presume that the trial court reviewed all of the evidence and decided the matter in the child's best interests. *In re McIntire*, 33 S.W.3d 565, 568 (Mo.App. W.D.2000).

■ We review the trial court's child support judgment under the standard announced in *Murphy*. Accordingly, we will affirm that judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Russell v. Russell*, 949 S.W.2d 87, 89 (Mo. App. W.D.1997).

## III. LEGAL ANALYSIS

### A. The Child Custody Determination

■ In his first point, Mr. Sarwar argues that the trial court overlooked evidence of Ms. Samdani's moral unfitness and her refusal to allow frequent and meaningful contact between Mr. Sarwar and Shereen.

■ Mr. Sarwar bluntly contends that his wife is a bad moral influence on their daughter because she has cultivated the habits of dishonesty and sloth. A parent's dishonesty is certainly one habit that a court may consider when awarding custody. *See, e.g., Petty v. Petty*, 760 S.W.2d 555, 557 (Mo.App. W.D.1988) ("Courts have also looked [at] the elementary virtues to be imparted to a child. One of these virtues is honesty or at least reasonable candor as opposed to duplicity.") (internal quotation marks and citation omitted). It is likewise reasonable to consider a parent's commitment to earning a living.

The trial court considered those habits here. In its findings of fact, the trial court acknowledged that Mr. Sarwar had presented evidence that Ms. Samdani "was dishonest in her dealings with [Mr. Sarwar] and others" and that he had also presented evidence that Ms. Samdani "was not diligent in pursuit of her medical license or gainful employment." Indeed, the court found this evidence to be true. Nonetheless, the trial court concluded that the behavior of the parents was not decisive to the custody ruling. The trial court

found that Ms. Samdani "has been the primary physical caretaker of the minor child throughout most of the child's life" and that it was in the child's best interests that Ms. Samdani retain primary [4] custody.

Although the trial court found the evidence mentioned above to be true, the trial court was not bound to focus on one factor to the exclusion of other factors. *See Gant,* 923 S.W.2d at 530 ("[W]e do not agree that we can codify the weight to be given the various factors. What is needed is a reasonable decision in light of all the relevant factors...."); *D—M—T— v. D—V—T—,* 483 S.W.2d 84, 86 (Mo.App. 1972) ("While it is true, as appellant says, that the morals of the respective parents are an appropriate subject of consideration in child custody cases ... that consideration is by no means exclusive. The guiding star is of course the best interests and the welfare of the children.") (internal citation omitted).

Mr. Sarwar also contends that Ms. Samdani has denied him frequent and meaningful contact with Shereen. The trial court has an obligation to consider "[w]hich parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent." Section 452.375.2(4). The trial court considered that factor here. In its findings of fact, the court found that Ms. Samdani had taken Shereen to Virginia:

> After Respondent and the minor child left the state of Missouri on January 31, 2001, without first notifying or obtaining Petitioner's consent, she remained in the State of Virginia until April 2001. Petitioner had no contact with the minor child that entire time. Respondent did not prohibit Petitioner from seeing the minor child but did nothing to enable Petitioner to do so. While the evidence

is unclear as to whether Respondent made any attempt to conceal their whereabouts, Petitioner had a reasonable basis for his stated fear that she would remove the minor child from the United States. The court acknowledges that during the months she was living in Virginia:

1. Respondent spoke with the Petitioner four to five times from her brother's home.
2. She was arrested at her brother's home on criminal kidnapping charges initiated by the Petitioner.
3. She was also served with Petitioner's Petition for Dissolution of Marriage at her brother's home in March 2001.

Nonetheless, the court determined that Ms. Samdani's actions were understandable given her circumstances. As the court explained:

> [B]ecause Respondent had no family support system in the Kansas City area and had been deprived of such support by Petitioner so long as she remained in their home, she had few, if any, alternatives to remain in Kansas City after the parties' separation. Petitioner and Respondent were married on December 25, 1996, in Pakistan. Said marriage was registered in Pakistan.

The trial court also found credible evidence that Mr. Sarwar had abused his wife, both physically and emotionally during the marriage. The trial court wrote:

> Petitioner controlled Respondent's contacts with her family, allowing virtually no personal contact between them during the entire time that the parties lived together as spouses. The Court considers the refusal of Petitioner to allow Respondent access to her family during the marriage, especially in light of the

---

4. As noted already, the term "primary" is a misnomer in this context.

significant interaction with his family, to be evidence of some emotional abuse and isolation of Respondent.

Respondent testified to numerous acts of physical violence and other mistreatment of her by Petitioner. Whether Respondent's testimony in this regard is entirely accurate, the Court finds it credible that some physical and certainly emotional abuse of the Respondent by the Petitioner occurred during the marriage.

There is substantial evidence in the record to support the trial court's findings. Viewed in the light most favorable to the trial court's verdict, the evidence shows that Ms. Samdani and her daughter went to stay with Ms. Samdani's brother in Virginia shortly after an incident on January 31, 2001, in which Mr. Sarwar locked Ms. Samdani out of the family home. The police investigated the incident after Ms. Samdani called 911. During that investigation, Ms. Samdani reported that Mr. Sarwar had slapped her on other occasions. Mr. Sarwar admitted that he had slapped his wife in the past, although he now claims that he only slapped her once. Ms. Samdani also testified that Mr. Sarwar prohibited her from seeing her family or from allowing them to see her during the marriage.

These facts distinguish the present case from *Rinehart v. Rinehart*, 877 S.W.2d 205 (Mo.App. S.D.1994), a case on which Mr. Sarwar relies. In *Rinehart*, there was evidence that the husband took the children without any explanation and without informing his wife where they were. *Id.* at 208. Unlike the husband in *Rinehart*, Ms. Samdani had an explanation for her actions, which the trial court found credible: to escape from a physically and emotionally abusive spouse who had isolated her from relatives. Moreover, Mr. Sarwar agrees that Ms. Samdani called to inform

him of their whereabouts after they arrived at her brother's home in Virginia. We further note Mr. Sarwar's statement that he took Shereen on a trip to Hawaii with Ms. Samdani's "total approval." That is some evidence that Ms. Samdani is likely to allow Shereen frequent, continuing and meaningful contact with Mr. Sarwar.

Given the standard of review in this case, we conclude that the trial court did not err in awarding physical custody to Ms. Samdani. What we said in another case bears repeating here:

> [I]t is apparent from the lengthy recitation of the facts to support his position that [Mr. Sarwar] has lost sight of the principle that due regard is given to the trial court's determination of credibility, viewing the evidence and permissible inferences therefrom in the light most favorable to the decree, disregarding all contrary evidence and inferences.

*Johnson*, 839 S.W.2d at 717.

We have reviewed the record carefully. The evidence in this case largely centers on Mr. Sarwar's word against Ms. Samdani's; the evidence is hardly as clear as Mr. Sarwar would have one believe. The evidence as a whole does not paint a flattering picture of either parent. The trial court appears to have resolved the conflicting evidence appropriately. As this court has said before, "[t]he trial court is in the best position to judge the credibility of the witnesses and to assess the character of the parties. The court may believe all, part, or none of any witness's testimony." *Gant*, 923 S.W.2d at 531.

Point I is denied.

## B. Calculation of Form 14 Child Support

### 1. The Trial Court's Failure to Take Into Account Maintenance

■ Mr. Sarwar contends that the trial court should have rejected the Guardian Ad Litem's Form 14 because the Form 14 did not calculate the trial court's award of maintenance to Ms. Samdani. The directions for completing Form 14 provide that "[i]f the court is establishing both child support and maintenance, the court shall first determine the appropriate amount of maintenance. This amount shall be included as an addition to the gross income (line 1a) of the parent receiving the maintenance and as a reduction in the gross income (line 2b) of the parent paying the maintenance." DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM NO. 14, Line 2b, A. COMMENT.

Both parties agree that the trial court did not follow these directions. The trial court's failure to follow these directions is error. *Monnig v. Monnig*, 53 S.W.3d 241, 249 (Mo.App. W.D.2001) ("The trial court did not follow these instructions in filling out its Form No. 14 in this case. On remand, if the court enters the award of maintenance, the proper adjustments should be included in its Form No. 14 calculations.").

We agree with Ms. Samdani, however, that the error did not result in any prejudice to Mr. Sarwar because the trial court also rebutted the Guardian Ad Litem's Form 14 calculation of $1,108.55 as unjust or inappropriate under the circumstances [5] and instead ordered Mr. Sarwar to pay $900 per month in child support. Even if the trial court had taken maintenance into account, Mr. Sarwar's Form 14 presumed correct child support amount still would have been $1,061.48 per month,[6] or $161.48 more than the actual child support award.

Mr. Sarwar does not contend that the trial court erred in rebutting the presumed correct child support amount or identify how he suffered prejudice from the trial court's rebuttal of the presumed correct child support amount. Absent any showing of prejudice, the trial court's error is not reversible error. *Wood v. Wood*, 94 S.W.3d 397, 404 (Mo.App. W.D.2003).

## 2. The Trial Court's Failure to Award More Than a Ten Percent Visitation Credit

■ Mr. Sarwar next contends that the Form 14 amount is incorrect because it does not give him all of the visitation credit to which he is entitled. Line 11 of Form 14 allows the parent who pays child support to obtain an adjustment "for a portion of the amounts expended during periods of overnight visitation or custody" with that parent.

The Directions for completing Line 11 explain that the trial court should calculate the applicable adjustment by multiplying the basic child support amount found on line 5 of Form 14 by a pre-determined percentage set forth in a table that accompanies the Directions. DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM NO. 14, *Line 11:* Adjustment for a portion of amounts expended by the

---

**5.** The trial court rebutted the Form 14 amount as unjust or inappropriate "[b]ased on all of the evidence in this case, including the evidence concerning the significant responsibilities assumed by [Mr. Sarwar] in the care of the child...."

**6.** The trial court awarded Ms. Samdani $500 per month in non-modifiable maintenance. If this amount had been included in her gross income and deducted from Mr. Sarwar's gross income as the Form 14 Directions specify, then Mr. Sarwar's proportionate share of the combined adjusted monthly gross income would have dropped from eighty-eight percent to eighty-five percent, resulting in a presumed correct child support amount of $1,061.48 instead of the $1,108.55 on the Guardian Ad Litem's Form 14.

parent obligated to pay support during periods of overnight visitation or custody. According to the Directions, this adjustment multiplier "is based on the number of periods of overnight visitation or custody per year awarded to and exercised by the parent obligated to pay support under any order or judgment." *Id.*

The table only provides adjustment multipliers for cases in which the parent who pays support has been awarded periods of overnight visitation or custody for fewer than one hundred ten days per year, however. But the Directions also recognize that "[i]f the parent obligated to pay support is or has been awarded periods of overnight visitation or custody for more than 109 days per year, the adjustment for that parent may be greater than [the maximum] 10% [adjustment set forth in the table]." *Id.*

In *McCandless–Glimcher v. Glimcher*, 73 S.W.3d 68 (Mo.App. W.D.2002), this court considered a case in which the parent who paid child support was awarded 183 days of overnight visitation per year. *Id.* at 75. We held that the trial court erred when it gave the support-paying father a ten percent overnight visitation adjustment, but then cut his presumed child support amount in half and subtracted the mother's presumed child support amount from the father's to determine the father's child support obligation. *Id.* at 76. We remanded the case so that the trial court could recalculate the Form 14 amount. *Id.* In so doing, we said the following about the line 11 adjustment:

> In recalculating the Form 14, Father is entitled to an adjustment in his child

support obligation for the 183 days the children spend with him. Because the table provides for an adjustment for only up to 109 days, *the court is permitted to set an adjustment greater than ten percent.* In setting this adjustment, the court should be guided by the assumptions listed in Subsection (12) of the "Assumptions" section of the Form 14 directions … Therefore, in setting the amount of the overnight adjustment to which Father is entitled, the court should assume that, having the children 183 days per year, Father will incur variable expenditures, such as food; duplicated fixed expenditures, such as housing; but will not incur significant non-duplicated fixed expenditures, such as clothing for the children. *If the court wants to give Father the maximum overnight visitation adjustment,* the maximum overnight visitation adjustment for having the children 183 days per year is thirty-four percent.[7]

*Id.* at 77 (emphasis added).

In this case, the trial court adopted the Guardian Ad Litem's Form 14, which used a ten percent adjustment multiplier, even though the trial court awarded Mr. Sarwar substantially more than 109 days of overnight visitation. While *Glimcher* supports Mr. Sarwar's contention that he is entitled to an adjustment in this case and that an appropriate adjustment multiplier could exceed ten percent here, we disagree with Mr. Sarwar that *Glimcher* obligates the trial court to use a multiplier greater than ten percent. As we said in *Glimcher*, the court is "permitted" to set an adjustment greater than ten percent and may award the maximum adjustment if it "wants" to

---

7. The thirty-four percent maximum referred to in *Glimcher* derives from an article authored by a St. Louis County associate circuit court judge, the Honorable Joseph A. Goeke, III, in which he calculated adjustment multipliers for cases where the parent who pays

child support has more than one hundred nine days of overnight visitation. *See* Hon. Joseph A. Goeke, III, *The Missouri Custody Adjustment Methodology: Where Did the Numbers Come From?*, 54 J. MO. BAR 305, 309 (1998).

do so. Nothing in that language is mandatory, a fact confirmed by our earlier decision in *Hatchette v. Hatchette,* where we held that the trial court did not abuse its discretion in failing to apply an adjustment multiplier greater than ten percent where the father's overnight visitation exceeded 109 nights per year. 57 S.W.3d 884, 891 (Mo.App.W.D.2001). In that case we said:

> The Form 14 directions indicate that the trial court was not obligated to give Husband an adjustment exceeding 10%, but could do so in its discretion. Husband's brief cites two cases where trial courts exercised discretion to deviate upward from the 10% adjustment and were upheld on appeal. . . . Neither case supports Husband's argument that the trial court was *required* to make the upward adjustment and erred in failing to do so.

*Id. See also,* DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM No. 14, *Line 11, supra* ("If the parent obligated to pay support is or has been awarded periods of overnight visitation or custody for more than 109 days per year, the adjustment for that parent *may* be greater than ten percent.") (emphasis added).

Accordingly, Mr. Sarwar's second point is denied.

### IV. Conclusion

For the reasons explained in this opinion, we affirm the judgment of the trial court.

PAUL M. SPINDEN, P.J., and RONALD R. HOLLIGER, JJ. concur.